# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**In re:**

**AIG BAKER VESTAVIA, L.L.C.,**

**Debtor.**

**Chapter 11**

**Case Number 10-02600-TOM11**

## TRIAL BRIEF

AIG Baker Vestavia, L.L.C. (the "Debtor") submits this trial brief in support of its motion determining that the rents generated from the property are cash collateral and to authorize it to use the cash collateral (the "Cash Collateral Motion") and in opposition to Propst Vestavia, LLC's ("Propst") motion to dismiss the Debtor's bankruptcy case, or in the alternative, granting relief from the automatic stay (the "Motion to Dismiss").

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

The Debtor owns a shopping center in Vestavia Hills, Alabama (the "Property") with non-residential real property leases (the "Leases").

On March 12, 2002, the Debtor and Compass Bank ("Compass") entered into a Commitment Letter. On March 22, 2002, the Debtor and Compass entered into a Construction Loan Agreement (the "Loan"). The Debtor also executed a Promissory Note in favor of Compass in the amount of $33,000,000 (the "Note"), a Mortgage (the "Mortgage") on the Property and an Assignment of Rents and Leases (the "Assignment of Rents," the Commitment Letter, Loan, Mortgage, Assignment of Rents and Note collectively, the "Loan Documents").

The Loan matured on August 31, 2009. Before and after the maturity, the Debtor negotiated with Compass to refinance or modify the obligation. On February 10, 2010, Compass made written demand upon the Debtor for the indebtedness, but required payment "in full within five (5) business

days of the date of this letter."[1] Without notice to the Debtor, Compass purportedly assigned all of its rights and obligations under the Loan Documents to Propst.

On March 26, 2010, Propst notified the Debtor it was the "purchaser of the ... Loan from Compass" and demanded payment of the entire indebtedness within five (5) business days (the "March 26 Letter"). On March 29, 2010, Propst contacted tenants of the Property, demanding the rents (the "Rents") be paid to Propst (the "Direction Letters"). On April 2, 2010, Propst mailed a second letter to the Debtor alleging the Debtor's "[f]ailure to payoff the above-referenced loan in accordance with our letter of March 26, 2010[] has resulted in legal foreclosure proceedings being commenced." The newspaper advertisement announcing the foreclosure sale began running on April 3, 2010. On April 26, 2010 ( "Petition Date"), the Debtor filed a voluntary petition ("Petition") for relief under chapter 11.

## THE MOTION TO USE CASH COLLATERAL

### I.     The Rents Constitute Property Of The Estate Under Applicable State.

Propst asserts the Debtor conveyed 100% of its interest in the Rents under Alabama law. However, the language in the Mortgage and the Assignment of Rents demonstrates the parties intended the Mortgage and the Assignment of Rents to grant a security interest.

Propst believes its analysis begins and ends with the fact that Alabama is a "title state" – *i.e.*, a state, in which, according to Propst, a mortgage automatically "passes legal title to the mortgagee." *See* Propst Objection, p. 8, ¶ 20. Propst argues the Mortgage, which includes a provision purporting to assign the Rents to Compass, absolutely assigned the Rents to Compass upon the Debtor's execution of the Mortgage. *Id.*, p. 8, ¶ 20-21.[2] However, Propst ignores

---

[1] Under paragraph 8(a) of the Loan, it is an event of default if the Borrower (the Debtor) fails to make a payment of principal and interest on the Note "within ten (10) days after written notice that same was not paid on that date when due and payable." No ten (10) day noticed has ever been provided by Compass.
[2] Propst also argues that the rents were absolutely assigned to Compass by the separate Assignment of Rents.

2

significant decisions finding a court must examine the mortgage or other assignment instruments, as well as the intent of the parties and the substantive effect of the agreements, in order to determine whether the assignment was an absolute transfer or the granting of a security interest.[3]

Even in those cases cited by Propst, the courts did not rule that the mortgagee owned the rents merely by virtue of Alabama's status as a "title state," but instead examined the provisions of the assignment documents in determining that the document absolutely assigned the rents.[4]

In *In re Turtle Creek*, the assignment of rents at issue was given "for the purpose of securing the prompt payment of the indebtedness" and that it was given "for the purpose of discharging the debt hereby secured."[5] Despite additional language in the assignment that purported to effect an absolute transfer of the rents, the court found the agreement evidenced an intent to create a security interest in the rents, therefore, the rents were property of the bankruptcy estate. The court stated it was necessary for the lender to take an additional action (such as foreclosure or sequestration of rents) in order to *perfect* its security interest in the rents.[6]

_____

[3] *See, e.g., In re Turtle Creek, Ltd.*, 194 B.R. 267 (Bankr. N.D. Ala. 1996) (stating that close reading of assignment of rents was necessary to distinguish absolute assignment from collateral assignment); *Gulf Life Ins. Co. v. Wal-Mart Stores*, 972 F. Supp. 575, 588 (M.D. Ala. 1997) (citing *Turtle Creek* and holding that rents were property of the estate when assignment agreement evidenced an intent to create a security interest); *see also In re Bethesda Air Rights L'td. P'ship*, 117 B.R. 202, 208 (Bankr. D. Md. 1990) (applying Maryland law, which is a title theory state, the bankruptcy court held that "substance should prevail over form" and found that assignment of rents was not absolute assignment, but rather security interest, despite language providing that assignment was absolute).

[4] *See Homecorp v. Secor Bank*, 659 So. 2d 15, 18-19 (Ala. 1995).

[5] *See Turtle Creek*, 194 B.R. at 278-80.

[6] *Id.* In its objection to the Cash Collateral Motion, Propst argues that because it took the additional step of sending the Direction Letters to the tenants and began collecting the Rents prior to the Petition Date, that somehow this action effected an absolute assignment of the Rents to Propst under the *Turtle Creek* decision. *See* Propst Objection, p. 9, ¶ 22-23. However, the holding in *Turtle Creek* is clear – the assignment of rents in that case was merely a grant of a security interest and an additional act was necessary to *perfect* that security interest (*i.e.*, there was not mention of a transfer of title and ownership). The bankruptcy court specifically found that "the recordation of the mortgage, without further action, did not fully *perfect* Condor's interest in the subject postpetition rents. Thus, although the recordation of the mortgages created a *security interest* in the rents, this *security interest* was not *perfected* until Condor filed its motion for turnover on May 26, 1995." *Turtle Creek*, 194 B.R. at 280 (emphasis added). Accordingly, at the very most, under the *Turtle Creek* decision, Propst's additional act of sending the Direction Letters had the effect of perfecting its security interest in the Rents (not transferring title to the Rents to Propst).

3

Here, the actual language in the Loan Documents and the parties' course of performance and conduct, demonstrate that the parties did not intend for the Mortgage or the Assignment of Rents to effect an absolute transfer of the ownership of the rents to Compass.

### A.    The Loan Documents Contain Contradictory Language.

The Debtor does not contest that the Mortgage and the Assignment of Rents contain provisions that allegedly effect an assignment of the Rents and the Property.[7] However, the Mortgage and the Assignment of Rents contain numerous contrary provisions that clearly indicate that the parties intended to effect only the grant of a security interest in the Property and the Rents. Specifically, the documents state in relevant part:

- The third WHEREAS clause of the Mortgage states that the parties "*desire to secure* the principal amount of the Note with interest, and all renewals, extensions and modification thereof." *See* Mortgage, p. 1 (Preamble) (emphasis added).

- The NOW, THEREFORE clause of the Mortgage expressly states that the conveyance of the Property was "*in consideration of Lender's making the Loan, to secure the prompt payment of same*" and "further *to secure the performance* of the covenants, conditions and agreements hereinafter set forth and set forth in the Note and set forth in all other documents evidencing, *securing* or executed in connection with the Loan." *See* Mortgage, p. 1 (Preamble) (emphasis added).

- The NOW, THEREFORE clause defines Mortgaged Property, which would include the Property and Rents, as certain land, real estate, estates, buildings, improvements, fixtures, and personal property, together with "any additional such property in the possession of the Lender or hereafter acquired by the Borrower and *subject to the lien of this Mortgage.*" *See* Mortgage, pp. 1-2 (Preamble) (emphasis added).

- Section 1.03 of the Mortgage states "*... this Mortgage is intended to and does secure* not only the Loan, but also future advances and any and all Other Indebtedness, obligations and liabilities." *See* Mortgage, p. 3 (Section 1.03) (emphasis added).

- Section 1.09 of the Mortgage states that the Debtor provides further assurances that it will take all actions "necessary or desirable in order to effectuate, complete, or *perfect*, or to continue and preserve the obligation of the Borrower under the Note and this mortgage, and *the priority of this Mortgage as a first and prior lien upon all of the*

---

[7] *See* Mortgage, p. 1-2 (Preamble) and p. 9 (Section 2.01). Additionally, the Assignment of Rents purports to "sell, assign and transfer unto the Lender all leases, subleases and lease guaranties of or relating to all or part of the [Property]." *See* Assignment of Rent, p. 1 (Preamble).

*Mortgaged Property.*" That section further states that "[*t]he lien and rights hereunder automatically will attach* ... to all after-acquired property." *See* Mortgage, pp. 5-6 (Section 1.09) (emphasis added).

- Section 1.11 of the Mortgage states that the Debtor "shall not cancel, surrender or modify any lease affecting the Mortgaged Property or any party thereof without written consent of the Lender," thereby evidencing the parties acknowledgement that the Debtor was the continuing owner of the Rents and Leases and had the legal power to effect modifications thereto. *See* Mortgage, p. 6 (Section 1.11).

- Section 2.01 of the Mortgage, which addresses assignment of the Rents and Leases, states the assignment of Rents and Leases was "*in consideration of Lender's making the Loan* as aforesaid and for other good and valuable consideration, and *to secure the prompt payment of same* ...*, and further *to secure the performance of* the covenants, conditions and agreements hereinafter set forth and set forth in the Note [and other Loan Documents]." *See* Mortgage, p. 9 (Section 2.01) (emphasis added).

- Section 4.03(b) of the Mortgage requires Propst to use any income, revenue, rents, issues and profits of the Mortgaged Property (which includes the Property, Rents and Leases) to maintain the Mortgaged Property and repay the obligations owed by the Debtor. *See* Mortgage, pp. 11-12 (Section 4.03(b)). If Propst owns the Rents, Leases and Property, it should be able to use or apply the proceeds as it wishes.

- Pursuant to Sections 4.03(a) and (b) of the Mortgage, upon on event of default under the Loan Documents, Propst is permitted to enter and take possession of the Property and may "as attorney-in-fact or agent of the Borrower ... hold, store, use, operate, manage and control the Mortgaged Property ... and conduct the business thereof." *See* Mortgage, p. 11 (Sections 4.03(a) and (b)). This provision reflects the parties' recognition that even after the occurrence of an event of default, the Debtor has a property interest in the Property, Rents and the Leases and authorizes Propst (as assignee) to act as the Debtor's attorney-in-fact with respect to such property interest.

- The second WHEREAS clause of the Assignment of Rents states that, in addition to the Mortgage, the Debtor "*desires to further secure*" the obligations under the Loan Documents. *See* Assignment of Rents, p. 1 (Preamble) (emphasis added).

- The NOW, THEREFORE clause of the Assignment of Rents states that the Debtor was making the assignment of Rents and Leases "as **FURTHER AND ADDITIONAL SECURITY** as aforesaid to the Lender, and *to secure the prompt payment of the Loan and Note*, .... and *further to secure* the performance of the covenants, conditions and agreements hereinafter set forth and set forth in the Note, in the other Loan Documents, and in the Other Indebtedness Instruments." *See* Assignment of Rents, p. 1 (Preamble) (emphasis added).

- Pursuant to language in the first paragraph on page 3 of the Assignment of Rents, upon on event of default under the Loan Documents, Propst (as assignee of Compass) is

5

permitted to enter and take possession of the Property and may "as attorney-in-fact or agent of the Borrower ... hold, operate, manage and control the [Property] and conduct the business," including the administration of the Leases. *See* Assignment of Rents, p. 3. This provision reflects the parties' recognition that even after the occurrence of an event of default under the Loan Documents, the Debtor has a property interest in the Rents and the Leases and authorizes Propst (as assignee of Compass) to act as the Debtor's attorney in fact with respect to such property interest.

- Pursuant to language in the second full paragraph on page 3 of the Assignment of Rents, Propst must use any "avails, rents, issues and profits of the [Property]" to maintain the property and to repay the obligations owed by the Debtor under the Loan Documents. *See* Assignment of Rents, p. 3. If Propst owns the Rents, Leases and Property, it should be able to use or apply the proceeds as it wishes.

An ambiguity in a contract exists if the terms are reasonably susceptible to two or more constructions.[8] The language of the Mortgage and Assignment of Rents is ambiguous, and it can be interpreted as an absolute assignment or as a security interest. When presented with an ambiguous contract, a court may look to the parties' conduct to resolve the ambiguity.[9]

Courts have determined that a lender's assignment of rents is ambiguous when it contains similar language suggesting both an absolute assignment and an assignment intended for security.[10]

---

[8] *See, e.g., Int'l Paper Co. v. Madison Oslin, Inc.*, 985 So. 2d 879, 885 (Ala. 2007) (stating that term is ambiguous if, "applying the ordinary meaning, one would conclude that the provision containing the term is reasonably susceptible to two or more constructions") (quoting *Safeway Ins. Co. of Alabama, Inc. v. Herrera*, 912 So. 2d 1140, 1144 (Ala. 2005)); *see also Whitetail Dev. Corp. v. Nickelson*, 689 So. 2d 865 (Ala. Civ. App. 1996).

[9] *See, e.g., Voyager Life Ins. Co. v. Whitson*, 703 So. 2d 944, 949 (Ala. 1997) ("If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity."); *Port City Constr. Co. v. Henderson*, 48 Ala. App. 639, 642-643 (Ala. Civ. App. 1972) ("... when construing a written contract which is ambiguous, incomplete or uncertain as to all of the intentions of the parties, the court may consider extrinsic parol evidence as to surrounding matters and circumstances, including additional terms not included in the writing, in order to determine the actual intent of the parties to the agreement.").

[10] *See, e.g., In re Las Torres Dev., L.L.C.*, 408 B.R. 876, 881 (Bankr. S.D. Tex. 2009) ("[T]he loan documents are ambiguous because the Documents contain conflicting provisions insofar as they purport to create both a security interest in the Rents and to make an absolute assignment of these Rents."); *In re 5877 Poplar, L.P.*, 268 B.R. 140, 147 (Bankr. W.D. Tenn. 2001) (finding assignment language in deed of trust ambiguous when it used "absolutely" and "unconditionally" in the same sentence as the phrase "grants a security interest" and ultimately concluding that only a security interest was intended); *Lake County Trust Co. v. Two Bar B, Inc.*, 238 Ill. App. 3d 589 (Ill. App. Ct. 1st Dist. 1992) (same); *In re Thymewood Apartments*, 129 B.R. 505, 514-515 (Bankr. S.D. Ohio 1991) (finding ambiguity when assignment clause contained absolute language but also required bank to apply rents to costs of maintaining property which the court concluded was inconsistent with absolute assignment).

Case 10-02600-TOM11    Doc 167    Filed 07/19/10    Entered 07/19/10 11:12:35    Desc
Main Document    Page 6 of 18

Because the Mortgage and the Assignment of Rents supports both interpretations there is no doubt that the Mortgage and the Assignment of Rents are ambiguous.[11]

### B. The Course Of Conduct Of Compass And Propst Establishes That They Intended The Mortgage And Assignment Of Rents To Be For Security.

The conduct of Compass, Propst and the Debtor is consistent with the Debtor owning the Rents, the Property and the Leases and Compass and Propst enjoying a security interest in them.

#### 1. No Consideration for Assignment.

The Mortgage and the Assignment of Rents were executed as part of a secured financing transaction. Propst contends that as part of that financing transaction that the Debtor also conveyed to Compass 100% of its interest in the Property, Rents and Leases. However, Compass paid no additional consideration for the alleged transfer of the ownership of the Rents to Compass, notwithstanding the substantial value of the Property, Rents and Leases.

As noted in *In re Bryant Manor, LLC*, 422 B.R. 278 (Bankr. D. Kan. 2010) and *In re Amaravathi Ltd. P'ship*, 416 B.R. 618 (Bankr. S.D. Tex. 2009), if an absolute assignment had occurred, the lender would be required to credit the present value of the future rental stream against the debt; otherwise, the assignment would be a clear fraudulent transfer. Neither Propst nor Compass produced any evidence that reflected this credit on the balance of the loan.

#### 2. Compass and Propst Did Not Recognize Income From the Rents.

Neither Propst nor Compass produced any evidence that either Propst or Compass recognized or reported the income from the Property, Rents and Leases as its property or income on their respective books and records. Furthermore, if either Propst or Compass really believed that it

---

[11] Because Compass drafted the Mortgage and the Assignment of Rents, the conflicting and ambiguous language as to whether an absolute assignment was intended must be construed against Propst (as assignee of Compass). Under Alabama law, any ambiguity in a contract must be construed against the drafter of the contract. *See, e.g., SouthTrust Bank v. Copeland One, L.L.C.*, 886 So. 2d 38, 43 (Ala. 2003) ("[A]ny ambiguity in a contract must be construed against the drafter of the contract."). In similar cases, courts have construed assignment of rents clauses against lenders because the lenders drafted the language. *See, e.g., 5877 Poplar*, 268 B.R. at 147 (construing assignment of rents clause in deed of trust against bank); *In re Donato*, 170 B.R. 247, 254 (Bankr. D.N.J. 1994) (same).

was the owner of the Property, Rents and Leases, it would have been obligated to reflect the value of the Property, Rents and Leases as assets on their financial statements, to report the income derived from such property on their income statements, and to report and pay taxes on such income on their tax returns. Neither Compass nor Propst offered any proof that it did so.[12]

### 3. Compass and Propst Did Not Insure Their Respective Interests.

The Debtor can demonstrate that (a) it has an owner's title policy on the Property and Leases, (b) it maintains liability and property insurance on the Property, (c) neither Compass nor Propst has an owner's title policy with respect to the Property or Leases, nor has either ever maintained liability or property insurance as an owner, and (d) Propst has coverage under the Debtor's insurance policies as a loss payee. If Propst believed it owned fee title to the Property, Rents and Leases, it would have taken action to procure owner insurance coverage.

### 4. Compass and Propst Have Not Performed Landlord Obligations.

The Debtor has continued to function as the landlord for the Leases. Propst's only interactions with the tenants under the Leases are the Direction Letters.[13] The Debtor has continued to perform the obligations of the landlord, including interfacing with tenants regarding day to day issues and discussing new leases with potential tenants. Propst has offered no proof it was performing the obligations of the landlord (a role that they contend now belongs exclusively to Propst). Additionally, Compass stipulated that at no time did it perform the obligations of the landlord under the Leases. *See* Compass Stipulation, ¶¶ 5(G) – 5(I).

Due to the ambiguous language in the Mortgage and Assignment of Rents, Propst and Compass's course of conduct must be considered with respect to the purported assignments. Here,

---

[12] In fact, Compass stipulated that it did not recognize or report income from the Property, Rents or Leases as its own in its books and records or tax returns. *See* Joint Stipulation of AIG Baker Vestavia, L.L.C., AIG Baker Shopping Center Properties, L.L.C., Propst Vestavia, LLC, and Compass Bank, Docket No. 152, ¶¶ 5(J) – 5(Q) ("Compass Stipulation").

[13] Upon information and belief, Propst may have improperly contacted tenants about future plans for the Property.

Case 10-02600-TOM11    Doc 167    Filed 07/19/10    Entered 07/19/10 11:12:35    Desc
Main Document      Page 8 of 18

Propst has the burden of proof on the issue of the extent of its interest in the Property, Leases and the Rents.[14] As evidenced by their conduct, neither Compass nor Propst consider themselves to be the owner of the Property, Rents or Leases and acted in a manner that was inconsistent with Propst's assertion that it absolutely owns the Property, Rents and Leases. It is clear that the Mortgage and Assignment of Rents were intended by the parties to provide only a security interest in the Property, Rents and Leases and were not intended as an absolute assignment of such property.

## II.    Even If The Court Determines The Rents Were Absolutely Assigned, The Rents Are Property Of The Debtor's Estate As A Matter Of Federal Law.

Federal law mandates that the Rents generated from the Property constitute property of the Debtor's estate regardless of whether the parties effected an absolute assignment under state law. It is well-settled that state law must yield if it is contrary to federal law.[15] In addressing the issue of whether a debtor's interest in rents from real property constituted property of the estate, the Supreme Court in *Butner v. United States* articulated the general proposition that property rights are defined by state law. The Supreme Court made clear that federal bankruptcy law would override state law if there were a statute defining the rights of a mortgagor and mortgagee in and to rents generated from property of a bankruptcy estate:

> The Constitutional authority of Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States" would *clearly encompass a federal statute defining the mortgagee's interest in the rents and profits earned by property in a bankrupt estate.* But Congress has not chosen to exercise its power to fashion any such rule.

440 U.S. 48, 54 (1979) (emphasis added).

---

[14] 11 U.S.C. § 363(p)(2).

[15] *See* U.S. CONST. ART. VI, CL. 2 (noting that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *see also Marine Harbor Props. v. Manufacturer's Trust Co.*, 317 U.S. 78, 83 (1942) ("The federal bankruptcy power is, of course, paramount and supreme . . . .").

Case 10-02600-TOM11   Doc 167   Filed 07/19/10   Entered 07/19/10 11:12:35   Desc
Main Document    Page 9 of 18

In response to *Butner*, Congress set out section 541(a)(1) which provides that the debtor's estate includes "all legal and equitable interests of the debtor in property as of the commencement of the case." Whether property is included within the ambit of section 541(a)(1) would (in the absence of overriding federal statute) be an issue of state law. Congress then identified in section 541(a)(6) an additional category of property which is to be included as property of the estate: "proceeds, product, offspring, rents, or profits of or from property of the estate." 11 U.S.C. § 541(a)(6). Congress provided that a bankruptcy estate would include all rents and profits generated from real property or real property leases so long as the underlying real property or leases constituted property of the estate.[16] Pursuant to the plain language of section 541(a)(6), if the Rents derive from property which is part of the estate under section 541(a)(1), it is irrelevant whether the Rents themselves are property of the estate under state law.

As described by the court in *Amaravathi*:

> A review of pertinent sections of the Bankruptcy Code demonstrates that Congress created a wholly rational structure for resolving disputes involving post-petition rents:
>
> - Section 541(a)(6) makes post-petition rents property of the estate;
> - Section 552(b) extends a lender's pre-petition collateral interest in rents to rents that are collected postpetition; and
> - Section 363 mandates that the debtor-in-possession provide adequate protection before the rents can be utilized by the estate.

416 B.R. at 624.[17]

---

[16] *See Amaravathi*, 416 B.R. at 628 (holding that by virtue of section 541(a)(6), all rents generated from property of the estate are also property of the estate, and that section 541(a)(6) controls this issue regardless of any state law to the contrary); *see also Bryant Manor*, 422 B.R. at 287-289 (finding "§ 541(a)(6) requires the inclusion of the rents in the bankruptcy estate as a matter of federal law" and that, in enacting section 541(a)(6), Congress "effectively preempt[ed] any state law that might provide for different treatment.").

[17] In *Amaravathi*, the court found, among other things, that section 541(a)(6) of the Bankruptcy Code: (i) balances the interests of debtors, mortgagees, and unsecured creditors; (ii) was a wholly rational exercise of Congress' authority to supersede state law; and (iii) further incentivizes debtors and creditors to behave efficiently. *Amaravathi*, 416 B.R. at 624 (recognizing that "[i]t is a fundamental principle of a capitalist society that when the owners of productive assets cannot benefit from the income produced by the assets, the incentive to produce income is eliminated."); *see also*

Case 10-02600-TOM11   Doc 167   Filed 07/19/10   Entered 07/19/10 11:12:35   Desc
Main Document    Page 10 of 18

Accordingly, under section 541(a)(6), all rents generated from property that is included in the Debtor's bankruptcy estate under section 541(a)(1) *also* constitute property of the Debtor's estate under section 541(a)(6) even if such rents are not part of the estate under section 541(a)(1).

## III. Even If The Court Concludes That The Rents Are Not Cash Collateral, The Loan Documents Require Propst To Apply The Rents To Maintenance Of The Property.

If the Court determines the Rents are not cash collateral, the Debtor will be unable to pay the expenses necessary for the operation of the Property. If the Property is not maintained, its value will diminish. Accordingly, to the extent Propst continues to collect the Rents during this chapter 11 case, it must use such Rents, along with any Rents collected prior to the Petition Date, to provide for the payment of all expenses necessary for the operation and maintenance of the Property,[18] including costs associated with tenant improvements and lease commissions, payment of the management fees and payroll allocation reimbursement to SCP Management, the property managers.[19] If the Court determines the Rents are not cash collateral, the Court should direct Propst to use rents collected for the purposes described in the Cash Collateral Motion.

## THE MOTION TO DISMISS

## I. The Debtor Did Not File The Case In Bad Faith.

In the Motion to Dismiss,[20] Propst argues that the Debtor's case should be dismissed because it was filed in bad faith based on the six factors set forth in *In re Phoenix Piccadilly*, 849 F.2d 1393, 1394-95 (11th Cir. 1988).[21] Although the Debtor disputes that all of the *Piccadilly*

---

*Bryant Manor*, 422 B.R. at 289 ("A contrary decision would effectively deny Chapter 11 relief to any debtor who is dependent on rents, such as . . . shopping centers . . . .").

[18] It is required by the Loan Documents. *See* Mortgage, p. 11 (section 4.03(b)); Assignment of Rents, page 3.

[19] Section 4.03 of the Mortgage and page 3 of the Assignment of Rents give Propst the option to take possession of the Real Property and assume the landlord responsibilities under the Leases after an event of default. However, Propst failed to exercise this option prior to the Petition Date, and the Debtor continues to serve as the landlord.

[20] For the reasons set forth herein, the Debtor also asserts Propst is not entitled to relief from the authmatic stay..

[21] Although the Eleventh Circuit held courts should still consider the *Piccadilly* factors, *In re State Street Houses*, 356 F.3d 1445 (11th Cir. 2004), *Piccadilly* was decided before Congress amended the Bankruptcy Code in 1994 to implicitly allow single asset real estate cases by assigning them a definition. *See In re Balboa Street Beach Club, Inc.*, 319 B.R.

factors are satisfied, even if the Court were to find that all of the *Piccadilly* factors were satisfied, that does not mean the case was filed in bad faith as a matter of law.[22] One court wrote, "The *Phoenix Piccadilly* case was a fact intensive decision where 'the entire record reeked of malice, spite and ill-will by the debtor.' ... Without this sort of 'smoking gun,' indicating an 'overt intent to inconvenience or frustrate creditors' rights beyond the congressionally permitted limits,' courts have been reluctant to find bad faith warranting dismissal."[23] Even after *Piccadilly*, the "real test that still remains is the presence of honest intention of the [d]ebtor and some real need and real ability to effectuate the aim of the reorganization ...."[24]

There is no evidence that the Debtor filed the Petition in bad faith or that the timing of the filing evidences an intent to delay the efforts of a secured creditor to enforce its rights. The Debtor filed the petition with the intent to reorganize and repay all of its creditors. The monthly rents collected by the Debtor from the tenants at the Property are the Debtor's only source of revenue. If the Debtor lost the Property, the Debtor would have no ability to reorganize. The Debtor filed the Petition with the honest intent to preserve its business and restructure its debt.[25]

---

736, 741 (Bankr. S.D. Fla. 2005). Moreover, in 2005, Congress further set forth a statutory scheme to adress single asset real estate cases.

[22] *See In re Clinton Fields, Inc.*, 168 B.R. 265, 271 (Bankr. M.D. Ga. 1994) (writing "this Court can not mechanically treat [the *Piccadilly*] factors as determinative of bad faith").

[23] *PNC Bank, National Association v. Park Forest Development Corp.*, 197 B.R. 388, 393-94 (Bankr. N.D. Ga. 1996) (citations omitted).

[24] *In re North Redington Beach Associates, Ltd.*, 91 B.R. 166, 169 (Bankr. M.D. Fla. 1988) (denying motion to dismiss despite presence of many *Piccadilly* factors).

[25] *See In re Travelot*, 286 B.R. 447, 461 (Bankr. S.D. Ga. 2002) ("When Travelot filed its case, its survival was on the line. Its intention in filing was clearly to preserve itself, rather than to frustrate CNN, regardless of the effect of the filing on CNN's rights to terminate the [c]ontract."); *see also In re Harco Co. of Jacksonville, LLC*, 331 B.R. 453, 457 (Bankr. M.D. Fla. 2005) (finding that because revenues were insufficient to pay debt need for reorganization was imminent).

This case is not the typical situation contemplated by *Piccadilly* because the Property is fully-developed and has an operating business generating significant revenues.[26] Although the Debtor only holds the Property, Loan paragraph 6(m) prohibits the Debtor from holding any other asset. That the Debtor abides by a requirement under the Loan is not evidence of bad faith.

## II. There Is Substantial Evidence That Propst Is Acting In Bad Faith.

This is not typical case in which a secured lender is seeking to dismiss a case to salvage value on its security. Instead, Propst is a competitor involved in real estate development - not a lender. It purchased the Loan Documents at a deep discount in an effort to gain control of the Property. In fact, Propst purchased the Note with a face amount of approximately $40 million for $25.9 million yet rejected the Debtor's offer to buy the Note for at least $28 million approximately a week later. It is Propst that is acting in bad faith in filing the Motion to Dismiss.

### A. The Assignment Of The Note Is Not Valid.

First and foremost, there is pending litigation[27] as to whether the assignment of the Note to Propst is even valid. The Loan contains strict limits on the parties' ability to assign their rights and obligations under the Loan Documents. Specifically, Compass may assign its rights under the Loan Documents "to one or more *financial institutions*." (emphasis added). Alabama law defines a "financial institution" as a "banking, mortgaging corporation or trust company, savings and loan association, insurance company or related corporation, partnership, foundation, pension fund[] or other institution engaged primarily in lending or investing funds."[28] Compass could only sell the

---

[26] *See In re North Redington Beach Associates, Ltd.*, 91 B.R. at 169 (noting that when setting forth *Picadilly* factors, Eleventh Circuit relied heavily on cases that involved a debtor not engaged in ongoing business with a single asset consisting of undeveloped raw land).

[27] The Debtor filed suit in the Circuit Court of Jefferson County, Alabama on April 14, 2010 (Case No. 01-CV-2010-901247). In that action, the Debtor sought declaratory and compensatory relief from both Compass and Propst, and sought injunctive relief with respect to Propst's efforts to foreclose the Property. The Temporary Restraining Order sought by the Debtor was denied. Judge Vance denied the TRO on an incomplete factual record.

[28] Ala. Code § 10A-20-7.01.

13

Note to entities within this definition. Propst does not meet this definition, as its business is owning the debt on the Property. The Debtor bargained for this limitation to ensure any assignee was an institution subject to regulation, whose interest would be in acting as a lender and not a competitor for the Property. "[C]ontract interpretation is guided by the intent of the parties, which, absent ambiguity, is evidenced by the plain language of the contract."[29] The restriction against transferring the obligations under the Loan Documents is unambiguous, therefore, the Loan must be enforced as written. Compass was contractually prohibited from transferring the Note to Propst, and Propst has no rights under the Loan Documents. Because Propst knew[30] or should have known Compass was prohibited from transferring its rights to a non-financial institution, Propst cannot maintain it was unaware of this restriction.

**B.** **Propst Did Not Follow Procedure To Affect A Foreclosure Or Demand Rents.**

Propst did not follow the proper procedures to affect a foreclosure. The Loan provides that only upon an "Event of Default" is the Lender permitted to "declare the unpaid principal . . . on the Loan immediately due and payable" and initiate a foreclosure if these "are not immediately paid in full." (The Lender cannot declare an Event of Default with respect to non-payment unless the Debtor "fails to make any payment of the principal or interest . . . within ten (10) days *after written notice* that the same was not paid on the date when due and payable."

Propst demanded payment in full "within five (5) business days of the date of" its March 26 Letter and threatened immediate foreclosure proceedings. In doing so, Propst declared an Event of Default without an occurrence constituting an Event of Default taking place, and denied the Debtor its right to ten days notice before initiating foreclosure proceedings. On April 2, 2010, Propst sent another letter to the Debtor alleging the Debtor's "[f]ailure to payoff the above-referenced loan in

---

[29] *United Land Corp. v. Drummond Co., Inc.*, 990 So. 2d 858, 866 (Ala. 2008) (internal quotation marks omitted).
[30] Propst admitted that its attorneys reviewed the Loan Documents prior to the purchase of the Note.

Case 10-02600-TOM11    Doc 167    Filed 07/19/10    Entered 07/19/10 11:12:35    Desc
Main Document    Page 14 of 18

accordance with our letter of March 26, 2010[] has resulted in legal foreclosure proceedings being commenced." The foreclosure sale ad began running the next day.

In *Board of Water & Sewer Commissioners v. Bill Harbert Construction Co.*, 27 So. 3d 1223, 1263-65 (Ala. 2009), the Alabama Supreme Court strictly construed the terms of a contractual ten-day notice-and-cure period. The court held the failure to comply with procedural technicalities, such as the failure to deliver the notice by registered mail, invalidated the purported notice. *Id.* The Loan required Propst to give the Debtor ten days to cure any non-payment before it could declare an Event of Default and initiate a foreclosure. Propst did not give proper notice, therefore no Event of Default had occurred when Propst initiated foreclosure.

Further, in its March 26 Letter, Propst demanded payment in full within five (5) business days. However, on March 29, 2010, Propst sent letters to the tenants of the Property instructing that they pay all Rents payable under the leases directly to Propst. Propst did not even give the Debtor the five days it promised to attempt to pay the Note in full. As such, Propst's Direction Letters to the tenants are ineffective and should not constitute an action to collect the rents.

### D.  Propst Knew Of The Debtor's Financial Condition Before Buying The Note.

Finally, Propst conducted due diligence prior to purchasing the Note. Propst knew (i) of the Debtor's financial condition; (ii) the Note had matured; (iii) of the tenant issues the Debtor faced including the proposed rent reduction for Rave; and (iv) that bankruptcy was an option for the Debtor, thus, Propst hired a bankruptcy attorney to negotiate the purchase of the Note. The fact that Propst purchased the Note despite all of this knowledge indicates that Propst may have improper motives with respect to the Property.[31] Further, the Debtor offered to purchase the Note from Propst for at least **$2 million more** than what it paid for it, yet Propst declined.

---

[31] *See In re Clinton Fields, Inc.*, 168 B.R. 265, 271 (Bankr. M.D. Ga. 1994) (finding indicia of debtor's good faith that secured creditor was aware of property's proposed use and problems debtor faced as development progressed).

## CONCLUSION

Based on the foregoing, the Court should grant the Cash Collateral Motion and deny the

Motion to Dismiss.

Dated: July 19, 2010

_____
Lee R. Benton (ABS 8421-E631)
Jamie Alisa Wilson

*Counsel for AIG Baker Vestavia, LLC*

**OF COUNSEL:**
**BENTON & CENTENO, LLP**
2019 Third Avenue North
Birmingham, Alabama 35203
Telephone: (205) 278-8000
Facsimile: (205) 278-8008
lbenton@bcattys.com

16

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

In re:

AIG BAKER VESTAVIA, L.L.C.,

Debtor.

Chapter 11

Case Number 10-02600-TOM11

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of July, 2010, I electronically filed the foregoing

TRIAL BRIEF with the Clerk of the Court using the CM-ECF system, which will send

notification of such filing to all parties requesting electronic service and, served a copy of the

above and foregoing upon the below-listed persons/entities by email, as follows:

Patrick Darby
Jennifer Henderson
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
pdarby@babc.com
jharris@babc.com

Charles L. Denaburg
Marvin E. Franklin
NAJJAR DENABURG, P.C.
2125 Morris Avenue
Birmingham, Alabama 35203
cdenaburg@najjar.com
mfranklin@najjar.com

J. Thomas Corbett, Chief Deputy
Bankruptcy Administrator
United States Bankrupty Court
1800 5th Avenue North
Birmingham, Alabama  35203
Thomas_Corbett@alnba.uscourts.gov

C. Ellis Brazeal III
JONES WALKER WAECHTER POITEVENT
 CARRERE & DENEGRE, LLP
1819 Fifth Avenue North, Suite 1100
Birmingham, AL 35203
ebrazeal@joneswalker.com

Jesse Vogtle, Esquire
Balch & Bingham
1901 6th Avenue North, Suite 1500
Birmingham, Alabama 35203
jvogtle@balch.com

24775335_2.DOC

Dated: July 19, 2010

/s/ Lee R. Benton
Lee R. Benton (ASB 8421-E631)
Amy M. Hazelton (ASB 4742-Y81M)
Jamie Alisa Wilson (ASB 8149-E58T)
*Counsel for AIG Baker Vestavia, LLC*

**OF COUNSEL:**
**BENTON & CENTENO, LLP**
2019 Third Avenue North
Birmingham, Alabama 35203
Telephone: (205) 278-8000
Facsimile: (205) 278-8008
lbenton@bcattys.com
ahazelton@bcattys.com
jwilson@bcattys.com

24775335_2.DOC